

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00251-CV

**IN THE INTEREST OF N.L.S.,** E.D.S., A.C.S., and I.S., Children

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2022PA00687
Honorable Raul Perales, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:    Beth Watkins, Justice
Lori I. Valenzuela, Justice
Sandee Bryan Marion, Chief Justice (Ret.)[1]

Delivered and Filed: July 5, 2023

AFFIRMED

Four children were the subject of the underlying termination proceeding: N.L.S., E.D.S, A.C.S., and I.S.[2] The Department of Family and Protective Services (the "Department") filed its original petition on April 28, 2022, and on March 20, 2023, the trial court held a bench trial at which several witnesses testified. Afterward, the trial court signed an Order of Termination terminating all parental rights to the children and appointing the Department as permanent managing conservator of the children. L.I.H., the appellant-mother, appeals the trial court's order

[1] The Honorable Sandee Bryan Marion, Chief Justice (Retired) of the Fourth Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE §§ 74.003, 75.002, 75.003.

[2] To protect the privacy of minor children, we use initials to refer to the children and their biological parents. TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2). These children were born on March 22, 2013; January 14, 2019; September 15, 2020; and March 17, 2022 respectively.

terminating her parental rights to all four children. D.S.S., the appellant-father, appeals the termination of his parental rights only as to A.C.S. We affirm.

**STANDARD OF REVIEW**

To terminate parental rights pursuant to Family Code section 161.001, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE §§ 161.001(b), 161.206(a). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re R.S.-T.*, 522 S.W.3d 92, 97 (Tex. App.—San Antonio 2017, no pet.).

In this case, the trial court found evidence of one predicate ground to terminate L.I.H.'s parental rights, specifically subsection (O) of section 161.001(b)(1). The trial court also found termination of her parental rights was in the children's best interest. Regarding D.S.S.'s parental rights to A.C.S., the trial court found evidence of one predicate ground to terminate his parental rights, specifically section 161.002(b)(1). The trial court also found termination of his parental rights was in A.C.S.'s best interest. On appeal, both parents challenge the legal and factual sufficiency of the evidence.

When reviewing the sufficiency of the evidence, we apply the well-established standards of review. *See* TEX. FAM. CODE §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (factual sufficiency); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (legal sufficiency). The trier of fact is the sole judge of the credibility of witnesses and the weight to be given their testimony. *See J.P.B.*, 180 S.W.3d at 573. In a bench trial, such as here, "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the

record on appeal." *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citation omitted). We therefore defer to the trial court's judgment regarding credibility determinations and will not substitute our judgment for the trial court's. *In re Z.R.M.*, No. 04-22-00787-CV, 2023 WL 2506430, at *4 (Tex. App.—San Antonio Mar. 15, 2023, pet. denied). While we must detail the evidence relevant to the issue of parental termination when reversing a finding based upon insufficient evidence, we need not do so when affirming a verdict of termination. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

When considering the best interest of the child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). "[T]he best interest standard does not permit termination [of parental rights] merely because a child might be better off living elsewhere." *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (citation omitted). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE § 263.307(a). The Department has the burden to rebut these presumptions by clear and convincing evidence. *See, e.g., R.S.-T.*, 522 S.W.3d at 97. To determine whether the Department satisfies its burden, the Texas Legislature has provided several statutory factors[3] for courts to consider regarding a parent's willingness and ability to

---

[3] The statutory factors include: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

provide a child with a safe environment, and the Texas Supreme Court has provided a similar list of factors[4] to determine a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

## BACKGROUND

Michelle Castillo[5] testified the case was referred to the Department because I.S. was born drug positive. Castillo said L.I.H. also tested drug positive, but she did not state when the drug test was taken. Castillo admitted L.I.H. did not drug test with the Department; instead, she tested with Elite Counseling. Castillo stated D.S.S. was the presumed father of all the children except A.C.S. According to Castillo, D.S.S. did nothing to legitimize his parentage of A.C.S. and he did not do a DNA test.

Castillo testified service plans were prepared for both parents. Castillo stated L.I.H. was required to complete a parenting class, a psychological evaluation, a psychiatric evaluation, and counseling. L.I.H. completed her psychiatric evaluation on August 31st and her psychological evaluation on September 26th, but L.I.H. did not follow the recommendations.[6] L.I.H. visited with the children throughout the case, the latest visit being the Friday before the trial; all the visits were appropriate; L.I.H. and the children appeared bonded; and L.I.H. provided clothes or snacks during the visits. Castillo said, "the most important service asked [of L.I.H.] was drug treatment and an

---

[4] The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72.

[5] Castillo was never asked to identify herself, but the parties' briefs identify her as the Department's caseworker.

[6] Castillo did not state the year, but the Department filed its original petition on April 28, 2022 and the trial occurred on March 20, 2023. Although this court should not be forced to speculate, we assume she was referring to August and September of 2022. *Moon v. State*, 451 S.W.3d 28, 49 (Tex. Crim. App. 2014) ("the juvenile court that shows its work should rarely be reversed"), *overruled by Ex parte Thomas*, 623 S.W.3d 370 (Tex. Crim. App. 2021).

OSAR assessment."[7] Elite Counseling recommended L.I.H. submit to inpatient counseling with Alpha Home. However, L.I.H. never started, much less completed, any inpatient treatment. When asked how she helped L.I.H. engage in her services, Castillo replied she would remind L.I.H. about who to call for her services and remind her to obtain her medication from the Center for Healthcare Services. Castillo testified, "[i]t was a lot of, you know, reminding her to do things, you know, to get ahold of this person. It was just a lot – I would text her throughout to see if she was going to start." Castillo explained L.I.H.'s reason for not entering the inpatient drug treatment program as follows:

> For the entering [sic] drug inpatient, I believe she needed to provide her own detox. And she did mention a few times that just different excuses on why she wasn't being [sic] able to get that medication to detox.
> . . .
> Before entering Alpha Home she would have to detox, like she would have to get medication; but she just never did. I'm not sure why.

Castillo was further asked about L.I.H. obtaining the medication before entering Alpha Home:

> Q. . . . Was that provided by the Department, she just had to pick it up?
> A. No. She had to get it on her own. That's what Alpha Home required before entering inpatient treatment.
> Q. Okay. And where was she supposed to get that medication?
> A. Before entering. In January, that's when they had a bed available. She was supposed to get that taken care of before she entered and just never followed through, never did.
> Q. Right. But my question was where was she supposed to get it? Was she supposed to get it from her doctor or –
> A. Yes, or Center for Healthcare Services could have provided that for her –
> Q. Okay.
> A. – since she didn't have any insurance.

Castillo could not verify whether L.I.H. still used drugs because she never tested for the Department. Castillo was aware of L.I.H.'s mental health diagnosis, which she did not explain,

---

[7] The record does not define OSAR or explain the service in any manner.

and that L.I.H. needed medication for that diagnosis. When asked if L.I.H. needed additional time to engage in her services because of that diagnosis, Castillo replied, "No. She's had plenty of time."

As for D.S.S., he was required to complete an OSAR assessment, drug assessment, parenting class, and a psychological evaluation, none of which he completed. Castillo said she "made contact" with D.S.S. early in the case, but she never met with him. His first visit with the children was the Friday before the trial. He did not provide any support for the children. She said D.S.S. had different telephone numbers and sometimes they were nonworking numbers. She attempted to meet him or find him at his mother's house, but she was not successful in finding him because he was "transient."

Castillo said that until recently the children were staying with their maternal grandmother, but were removed two or three weeks before the trial when E.D.S. was found by a neighbor in the street by himself. Apparently, unbeknownst to the Department, the maternal grandmother was allowing L.I.H. to stay at the house.

Castillo stated the Department's plan for the children is relative adoption and they were still seeking family members. The maternal grandmother provided a list of family members and D.S.S. provided the names of two relatives. The Department has not done a home study on any family member and is still "just gathering information." The eldest child, nine-year-old N.L.S., knows and understands, with the help of counseling, what is happening in the case and has been told the Department is looking for a family with whom she can stay. Castillo admitted she never asked N.L.S. whether she wanted to be adopted. Two of the children, E.D.S. and A.C.S., need special care and therapy because they both are autistic. Both children will need twenty-four-hour supervision and their caregiver needs to ensure they get the necessary therapy. Castillo believed it was in the children's best interest that L.I.H.'s and D.S.S.'s parental rights be terminated.

L.I.H. testified she was the mother of all the children, she has been diagnosed with PTSD, bipolar disorder 1, anxiety, and substance abuse. Regarding her efforts to obtain medication and get into drug treatment, she testified as follows:

Q. And do you take medication for all of those diagnoses?
A. No. Actually, I've been trying to call over and they – they will have availability on April 6th; but they said that I need to go to do my substance – I need to call a substance line or use or something like that before I do the mental – get medicated for the mental – for my mental health pretty much.
Q. Okay. Would you describe to the Court what efforts you've tried to take to get into drug treatment?
A. I'm a procrastinator, but I am trying – I know I – I should have done it a long time ago; but at the moment, as you can see, I'm moving everything alone (indicating), all of my kids' belongings. And it's been a hard time. And I'm not ready to have my rights terminated, and my kids need me and I need them.
Q. Okay. What is your plan to get into drug treatment?
A. My plan is to – well, first I have to call – which I just got the number for the substance first [sic] use and to get medicated for that. And, also, as well as my – she said first you need to do substance and then go do your mental health, which I didn't know that you had to do the whole runaround. [] I don't understand why Alpha Home –
Q. Well, let me – let me stop you there.
Did you ever discuss with Ms. Castillo, your caseworker, the fact that you needed to get drug treatment before you got mental health treatment?
                    [objection sustained]
Q. What – what did you and Ms. Castillo discuss regarding your mental health treatment and your drug treatment?
A. Nothing recently; but, yes, she's been – she's been telling me this and that. But I was just worried about the wrong thing, and I was just worried about my kids' expenses and living and stuff. But my next step which is putting everything in storage and –
Q. Sorry. Go ahead.
A. My next step is entering this program. Even though it's a runaround, I'm going to do –
Q. Let me stop you there for a second. What program are you going to be entering?
A. The – the Alpha Home. Well, I need to get medicated first, first, which I have an appointment for on April 6th.
Q. When you say you have to be medicated first, what type of medication do you have to get first?
A. They're both different, I guess. Like they said that they have – each diagnose [sic] are – some clinics treat them and some don't.
So I had to keep calling each one, which one of then [sic] said they will diagnose, like help me with.
And they said, I'm sorry. Like we can't help you with this or like they can only help me with bipolar disorder or the –

[objection sustained]

Q. Did you ever discuss the difficulty you were having getting into these programs with Ms. Castillo? Can you hear me?
A. Oh, yes, I have.
Q. And what was her response? What did she say?
A. Well, after she – she didn't know that I needed to get medicated first and then enter the – the Alpha Home.

. . .

Q. Okay. So when did you notify Ms. Castillo that you needed to be medicated before you could get into drug treatment?
A. I'm not too sure. Probably like – probably two months ago. Probably – I'm not too sure.
Q. And what was her response?
A. That she pretty much didn't know that as well and – yeah, she didn't know that as well. So that's why she was like, oh, wow, like (inaudible).
Q. So what steps did Ms. Castillo or somebody at the Department take to try to help you get medicated so that you could get the drug treatment that you need?
A. Referrals and she did remind and everything.
Q. Okay. And that's when you ran into the difficulty? Is that an accurate statement?
A. Yes. I ran . . . yes.
Q. Okay. Do you believe if the Court were to give you more time you would be able to get into drug treatment?
A. I will.
Q. How much longer do you need?
A. As – as fast as I – probably like within two months. I just got to – I'm alone. I'm moving my kids' belongings and – and everything by myself. So you have to see everything. It's hard, but I'm . . .

When asked if she was currently living at her mother's house, L.I.H. responded, "No. This is – my mother was living here, but ever since that day [one of the children was found alone outside] they [the police] pretty much ran her away. She – she took off, she left, . . ." L.I.H. said she did not complete her parenting class because the parenting classes she had with "Ms. Tara," "[s]he said she was switching to a different thing, but I never received or – or got a call for a new – for the parenting one-on-one. She just said she told me to do the home visit once. Like I'm not too sure what, but I never got another one; but the other ones I did. Like I did – I was just worried about the wrong things."

D.S.S. said he had been aware of the case throughout its pendency, but because he was homeless, lived on the streets, and did not have a job, it was difficult to keep his telephone on. After the first contact with the Department caseworker, he did not maintain contact because he did not have a telephone. About two to three weeks before the trial, he moved in with his mother and he has a job where he has been working for about five days. He said he wanted additional time to complete his services. He wanted the judge to give him the opportunity to show "that [he] could do it [and he] could take all the classes and everything and take custody of my kids." He stated that when he was homeless he did not take any classes required under his service plan because he had no transportation.

After closing arguments, the following exchange between L.I.H.'s attorney and the trial court occurred:

> Counsel: Judge, I would argue that there was no offering of any evidence other than the testimony that [D.S.S. is] alleged. He didn't have to do a Paternal Registry – nobody offered a Paternity Registry return.
> Court: We've closed at this point, Mr. Campbell.
> Counsel: Right. I know. There's no evidence. I know that's not my client, too, so . . .
> Court: Well, we've closed, guys. Thank you for being here.

### THE MOTHER'S APPEAL

The trial court found that L.I.H. "failed to comply with the provisions of a court order that specifically established the actions necessary for [her] to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children, pursuant to § 161.001(b)(1)(O), Texas Family Code." The court also found L.I.H. "did not prove by a preponderance of evidence that [she]: (l) was unable to comply with specific provisions of a court order; and (2) [she] made a good faith effort to comply with the order and the failure to comply with the order is not attributable

to any fault of [hers]." Finally, the court found termination of L.I.H.'s parental rights to all four children was in the children's best interest. On appeal, L.I.H. challenges the legal and factual sufficiency of the trial court's predicate-ground finding and best interest finding.

Although L.I.H.'s issue states she challenges the sufficiency of the evidence in support of the predict-ground finding, on appeal she concedes she did not complete her service plan. Instead, she relies on the defense provided in Texas Family Code section 161.001(d), which states as follows:

> A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:
> (1) the parent was unable to comply with specific provisions of the court order; and
> (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

TEX. FAM. CODE § 161.001(d).

L.I.H. testified she did not go to the required inpatient drug treatment because the treatment center required her to obtain a detox medication on her own before she was admitted to the program. Therefore, she made a good faith effort to complete this service.

## A.    Predicate Ground

We conclude the evidence is legally and factually sufficient to support the trial court's predicate-ground finding for several reasons. First, the evidence that L.I.H. did not complete her service plan requirements was undisputed. Second, in her argument that the defense offered under subsection (d) applies, she refers to only one of the various required services—drug treatment— and not the other required services. "Section 161.001(d) places the burden on the parent to prove by a preponderance of the evidence that she was unable to comply with the court-ordered service plan, she made a good faith effort to comply with the order, and her failure to comply is not attributable to any fault of her own." *In re L.E.R.*, 650 S.W.3d 771, 788 (Tex. App.—Houston

[14th Dist.] 2022, no pet.). L.I.H. testified she understood she needed to engage in her services. However, she offered no evidence at trial that she was unable to comply with the specific provisions of the court order, that she made a good faith effort to comply with the order, and that her failure to comply with it is not attributable to her fault. Instead, she offered an excuse only as to the drug treatment requirement. Thus, L.I.H. cannot rely on the affirmative defense provided by section 161.001(d) to negate the trial court's termination of her parental rights for failure to comply with a court order specifically establishing the actions necessary for her to obtain the return of her children.

## B.      Best Interest

A best-interest finding does not require proof of any particular factors. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest[.]" *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.). Evidence that proves a statutory ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). "A trier of fact may measure a parent's future conduct by his past conduct [in] determin[ing] whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

The record shows L.I.H. is bonded with her children and visited them regularly. "Although a child's love of his natural parents is a very important consideration in determining the best interests of the child, it cannot override or outweigh the overwhelming and undisputed evidence showing that the parents placed or allowed the child to remain in conditions, and engaged in conduct or placed the child with persons who engaged in conduct, which endangers the physical

and emotional well-being of the child." *In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.).

One of the statutory factors to consider "in determining whether the child's parents are willing and able to provide the child with a safe environment" is "whether there is a history of substance abuse by the child's family or others who have access to the child's home[.]" TEX. FAM. CODE § 263.307(b)(8). The evidence is undisputed that L.I.H. did not begin, much less complete, drug treatment. "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest." *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied). The trial court could have formed a firm belief or conviction that L.I.H. would continue to use drugs because of her past conduct and, due to her continued drug use, it would be in the children's best interests to terminate her parental rights. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied) ("This court considers a parent's conduct before and after the Department's removal of the children.").

Another statutory factor that should be considered in determining whether a child's parent is willing and able to provide the child with a safe environment is "the child's age and physical and mental vulnerabilities." TEX. FAM. CODE § 263.307(b)(1). Here, two of the children need special care and therapy because they both are autistic and they will need twenty-four-hour supervision and a caregiver who can ensure they get the necessary therapy.[8] A third child, the youngest, was born positive for drugs. The trial court, acting as the trier of fact and arbiter of witness credibility, was not required to find L.I.H.'s testimony or commitment to completing her service plan, in particular drug rehabilitation, credible. *See In re Z.R.M.*, No. 04-22-00787-CV,

---

[8] A child's special needs weighs in favor of termination to the extent the evidence suggests that "termination of [the] parental rights would improve the outlook" for the child's health. *See In re J.E.M.M.*, 532 S.W.3d 874, 887 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (reversing termination after observing, inter alia, that Department had not presented any evidence that termination of parental rights to child with autism would serve best interest).

2023 WL 2506430, at *4 (Tex. App.—San Antonio Mar. 15, 2023, pet. denied) ("A trial court may consider a parent's failure to complete a court-ordered service plan in determining a child's best interest."). Although the Department should have presented more evidence regarding the best interest issue,[9] we conclude the evidence presented was legally and factually sufficient to support the trial court's best-interest finding.

## THE FATHER'S APPEAL

On appeal, D.S.S. challenges the legal and factual sufficiency of the trial court's finding that he "did not respond by timely filing an admission of paternity or by filing a counterclaim for paternity or for voluntary paternity to be adjudicated under chapter 160 of the Texas Family Code before the final hearing in this suit, pursuant to § 161.002(b)(1) of the Texas Family Code."

"The rights of an alleged father may be terminated if . . . after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160." TEX. FAM. CODE § 161.002(b)(1). "Subsection (b)(1) allows a trial court to summarily terminate the rights of an alleged biological father who does not assert his paternity by filing an admission of paternity or a counterclaim for paternity." *In re A.D.*, No. 04-02-00310-CV, 2002 WL 31829510, at *1 (Tex. App.—San Antonio Dec. 18, 2002, no pet.). If the father files an admission of paternity or otherwise claims paternity, "then subsection (a) allows the alleged biological father to stave off summary termination of his rights and requires the Department to meet the high burden of proof found in section 161.001." *Phillips v. Tex. Dep't of Prot. & Regulatory Servs.*, 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.); *see* TEX. FAM. CODE § 161.002(a) ("Except as otherwise provided by this section, the procedural and substantive

---

[9] In this case in which the parental rights of the parents of four children were terminated, the reporter's record from the trial is a scant forty-three pages long, of which actual testimony is only about thirty-one pages. "Because '[d]ue process requires meaningful appellate review of orders terminating parental rights,' this court has repeatedly expressed concerns about underdeveloped records in parental termination appeals." *Z.R.M.*, 2023 WL 2506430, at *3 n.6.

standards for termination of parental rights apply to the termination of the rights of an alleged father."). "Thus, by filing an admission or counterclaim for paternity, the alleged father is given the right to require the state to prove by clear and convincing evidence that he engaged in one of the types of conduct listed in section 161.001(1) and that termination is in the best interest of the child." *A.D.*, 2002 WL 31829510, at *1. "If the alleged father, however, does not file such an admission or counterclaim, then subsection (b) permits the trial court to summarily terminate his parental rights without [the Department] having to meet the high burden of proof found in section 161.001." *Id.*

"Section 161.002 prescribes the filing of an admission of paternity, but there is no reference in the statute to any formalities that must be observed when 'filing' such an admission." *Toliver v. Tex. Dep't of Fam. & Prot. Servs.*, 217 S.W.3d 85, 105 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that because father appeared at trial before his rights were terminated and admitted he was in fact the child's father, his right to require the Department to prove he engaged in one of the types of conduct listed in section 161.001(1) before his parental rights could be terminated was triggered); *see also In re U.B.*, No. 04-12-00687-CV, 2013 WL 441890, at *2 (Tex. App.—San Antonio Feb. 6, 2013, no pet.) (mem. op.) ("There are no formalities that must be observed when filing an admission of paternity or for such an admission to be effective.") (holding father, after being served with citation, admitted to paternity when he (1) filed a pro se letter, directed to the judge in whose court the case was pending, that referred to the three children and to a fourth child as "my children," and stated "I'm interested in obtaining my parental rights and getting custody of my children," (2) requested temporary placement of the children with his parents if necessary, and (3) testified at trial he was the father of the children and he loved them, was capable of caring for them physically, emotionally, and medically, and was willing to take the necessary steps to do so); *In re E.O.*, 595 S.W.3d 858, 867 (Tex. App.—El Paso 2020, no pet.)

("Our sister courts have found that summary termination is defeated when, *inter alia*, a father writes a letter to the trial court in which he states he is the child's father; when a father who questions paternity throughout a pending case files a general denial and fills out an appointed counsel request form in which he states he is the child's parent; when a father acknowledges paternity to the Department and agrees to take a paternity test; when a father appears at trial and admits he is the child's father in open court; or when the father files an answer and a sworn affidavit identifying himself as the child's father.") (footnotes omitted).

Here, D.S.S. first asserts the Department offered no evidence that he failed to timely file an admission of paternity or a counterclaim for paternity. He contends the only evidence offered was Castillo's statement that D.S.S. did nothing to legitimize his parentage of A.C.S. and he did not do a DNA test. At trial, D.S.S. did not challenge Castillo's testimony, nor was he asked whether he was A.C.S.'s father.

D.S.S. next asserts he admitted paternity when he appeared at the trial, opposed termination of his parental rights, and asked for more time to complete his services "and take custody of my kids." D.S.S. contends nothing was offered to suggest he was not including A.C.S. in his request for custody of his children.

"Although informal methods have been accepted, not all conduct or actions of an alleged parent during the pendency of a termination of parental rights case qualifies as an informal admission of paternity." *E.O.*, 595 S.W.3d at 867-68 ("Other than make an assertion that he participated in services, however, Alleged Father does not cite to any record evidence directing our attention to conduct on his part, while participating in those services or being involved in the case, in which he demonstrated an 'admission of paternity,' or showed his opposition to termination of any rights he may have with respect to E.O."); *see also In re O.R.M.*, 559 S.W.3d 738, 742-43 (Tex. App.—El Paso 2018, no pet.) (alleged father's signed, handwritten notation

contained in comments section of family service plan was not an "unequivocal admission of paternity" despite the fact that alleged father's note included general references to "my kids" and expressed a desire to protect the children from their mother; father's note not only failed to include an admission that he was in fact the biological father of each of the three children who were the subject of the case, but also failed to express any opposition to the termination of any rights he may have had to the children).

D.S.S. appeared at the trial, opposed termination of his parental rights, and asked for more time to complete his services "and take custody of my kids." However, in view of the fact that he has four children who were the subject of the trial and he was the acknowledged father of three of those children, we conclude his reference to "my kids" is too vague to constitute an unequivocal admission that he is A.C.S.'s father. Therefore, the trial court did not abuse its discretion by summarily terminating his parental rights to A.C.S.

D.S.S. also asserts the evidence is insufficient to support termination of his parental rights to A.C.S. pursuant to Family Code section 161.002(b)(2).[10] The trial court terminated D.S.S.'s parental rights as to A.C.S. based only on subsection (b)(1). The court made no finding under subsection (b)(2); therefore, we need not address the merits of D.S.S.'s argument under this subsection.

## CONCLUSION

For the reasons stated above, we affirm the trial court's Order of Termination.

Lori I. Valenzuela, Justice

---

[10] "The rights of an alleged father may be terminated if . . . the child is over one year of age at the time the petition for termination of the parent-child relationship or for adoption is filed, he has not registered with the paternity registry under Chapter 160, and after the exercise of due diligence by the petitioner: (A) his identity and location are unknown; or (B) his identity is known but he cannot be located." TEX. FAM. CODE § 161.002(b)(2).